UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.:  02-60096-CR-DIMITROULEAS

UNITED STATES OF AMERICA,

      Plaintiff,

v.

IMRAN MANDHAI

      Defendant.

_____/



## OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT AND RE-SENTENCING MEMORANDUM AFTER REMAND OF JUNE 16, 2005

      The Defendant files the following regarding the Pre-sentence Investigation Report and his upcoming third sentencing hearing.

### The Mandate of the Eleventh Circuit

      This Court is free to reconstruct the sentence using any sentencing components, United States v. Stinson, 97 F. 3rd 466 (11th Cir. 1996), United States v. Zambrowski, 329 F. 3rd 1250 (11th Cir. 2003) because the appellate decision vacated the sentence, nullifying the prior proceedings. This is particularly true in light of the Supreme Court's ruling in *Booker*, which makes *Blakely* applicable to the guidelines and declared that the guidelines are merely advisory.

      A criminal sentence is a package of sanctions the District Court uses to effectuate its sentencing intent consistent with the (now advisory) guidelines, Stinson, supra, United States v. Yost, 185 F. 3rd 1178 (11th Cir. 1999). Since a



vacated sentence is void in its entirety, that Court is free to re-visit any rulings made at the initial sentencing, <u>Yost</u>, supra, and reconstruct the sentence utilizing any sentencing components, <u>Stinson</u>, supra. The Circuit Court specifically vacated Mr. Mandhai's sentence and remanded for re-sentencing because of the *Booker* statutory error.

The Eleventh Circuit also found in its first opinion regarding Defendant that his sentence was unjust.

> "We agree with the District Court, however, that the twelve level increase to Mandhai's offense level required by the terrorism enhancement prevents the penalties from fitting the crime, based on the facts of this record."

The panel noted that Defendant's sentence was unjust, specifically finding that "on this record" a sentence range of 188 to 235 months was excessive. The record will consist of no additional incriminating evidence.

Accordingly, Defendant is entitled to a full re-sentencing for consideration of a sentence below 188 months.

### Testimonial hearsay

Defendant objects to the introduction of testimonial hearsay pursuant to <u>Crawford v. Washington</u>, 124 S. Ct. 1354 (2004) particularly where Defendant contests the accuracy of the hearsay. Defendant will note specific *Crawford* objections to each paragraph of the Pre-Sentence Investigation report.

### The *Blakely/Booker* Objection

Defendant objects to the consideration by the Court for sentencing purposes of all facts other than those specifically alleged in the indictment and admitted by Defendant, <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004), <u>United</u>

States v. Booker, 125 S. Ct. 738 (2005). Further, Defendant requests that the Court resolve all disputed factual issues using the beyond the reasonable doubt standard.

In Blakely, supra, the Supreme Court held that a judge lacks the authority to impose a sentence dependent upon a fact not found by a jury or admitted in a guilty plea. This expanded the rule of Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) by redefining the statutory maximum,

"in other words, the relevant "statutory maximum" (quotations in original) is not the maximum   sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings."

Defendant specifically denied the very conduct relied upon for the terrorism enhancement, his association with Hakki Aksoy and  and his "Jihad" training.

The sentencing range based upon Defendant's base offense level of 20 and criminal history level 1 was 33 to 41 months. Since Blakely, supra, applies to the Federal guidelines then any sentence in excess of the base or statutory minimum is an upward departure from the advisory base offense level. The holding of Blakely, supra, is particularly compelling herein applying as it does to both the mandatory and the advisory guidelines.

"nor does it matter that the judge must, after finding aggravating facts, make a judgment that they present a compelling ground for departure. He can not make that judgment without finding some facts to support it beyond the bare elements of the offense. Whether the judicially determined facts *required* (emphasis in original) a sentencing enhancement or merely *allowed* (emphasis in original) it, the verdict alone does not authorize the sentence."

Similarly, the plea and indictment herein simply do not authorize the terrorist enhancement, whether the guidelines are mandatory or advisory.

Further the Government must prove any factors which the Court may seek to use to justify an upward departure beyond a reasonable doubt.

"every new element that a prosecutor can threaten to charge is also an element that a defendant can threaten to contest at trial and make the prosecutor prove beyond a reasonable doubt." <u>Blakely</u>, supra.

"As in *Apprendi*, every defendant has the *right* (emphasis in original) to insist that the prosecutor prove to a jury all facts legally essential to the punishment."

The fact that Defendant pled guilty herein while specifically contesting the application of the terrorist enhancement means that Defendant did not waive the right to have the enhancing facts proved beyond a reasonable doubt. <u>Booker,</u> supra, part one, specifically reaffirmed the Court's holding in <u>Apprendi,</u> supra, that

"any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorize by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."

Defendant did not admit all such facts so that the Government must prove same beyond a reasonable doubt.

## **Specific Objections**

**Alias, Page 2:**       Mohammed Imran and  Mohammed Mandhai are variations on Defendant's true name and family name and are used interchangeably in Pakistan.

USA vs. Mandhai
Case No. 02-60096-CR-DIMITROULEAS
Page 5 of 28

### The Offense Conduct

Defendant contends that all facts set forth, contested by Defendant, must be proven beyond a reasonable doubt, pursuant to <u>Blakely</u>, supra, <u>Booker</u>, supra. Defendant makes this general objection and requests that it be applied to each below listed challenged fact.

**Paragraph 5, Page 3:**        All comments attributed to Aksoy are inadmissible testimonial double or triple hearsay pursuant to <u>Crawford v. Washington</u>, 124 S. Ct. 1354 (2004). Aksoy's comments regarding overseas travel to participate in a jihad are irrelevant to the instant case and suggest an attempt to demonize Defendant through his association with Aksoy. Said comments are used by B.O.P to set conditions of confinement, and should be stricken as irrelevant and because Defendant's relationship with Aksoy was excepted by agreement during the plea.

Aksoy stated that he killed the two people to avenge the death of his father, a personal matter, not as part of "mujahadeen" activity (this comment should also be stricken). Transcript of March 23, page 16, FBI 302 of 5/29/02 page 3, paragraph 6. Defendant went with Aksoy twice to a gun range and once to a show. Defendant's discussions with Aksoy were never related to this case or any possible action in the United States.

**Paragraph 7, Page 4:**   Again all testimonial comments attributed to non testifying witnesses are inadmissible hearsay, <u>Crawford</u>, supra.

All these comments are irrelevant as Defendant and the Government agreed at the change of plea that activities in connection with "jihad" were not relevant conduct and additionally must be proven beyond a reasonable doubt.

Defendant adds the following. All references to jihad relate to possible overseas activities in the then distant future. Mandhai's training with Gilbert is overstated. Mandhai never received training in "Close Quarters Combat" or map reading. He went to a pistol range two or three times and a rifle range once. Training, according to Gilbert, the instructor and Government agent, was for general preparedness and as a way to supplement his, Gilbert's, income.

Defendant adds that Gilbert, in a tape provided in discovery, indicated that he had a dual agenda. In addition to freelancing for our government, he was working for the Israelis, thereby displaying a very personal motivation for his actions herein. Gilbert, much like religious fundamentalists of any persuasion, considered himself above the law. Gilbert went so far as to attend Defendant's first sentencing herein, wherein Gilbert took the opportunity to warn Farook Mandhai, Defendant's father, to "watch" Defendant's younger brother. Gilbert prepared the initial plan and was attempting to convince Mandhai to participate in the plan, (FBI 302 of 3/29/01 page 2). Gilbert's plan became the basis for the conspiracy and therefore for the Government contention that Defendant was a terrorist.

**Paragraph 9, Page 4:**   Defendant surmises that Gilbert's continued participation against the wishes of his FBI handlers as well as his disclosures to others relates to his stated desired to aid Israeli intelligence.

**Paragraph 10, Page 4:** The testimonial comments attributed to Mohammed are inadmissible, <u>Crawford</u>, supra. There was no transcript of this meeting.  Mohammed did not inform Defendant of the information stated in the paragraph relating to the Islamic resource center.   In later conversations Mohammed did refer to "the Brothers" as a source of financing from overseas.

At this meeting Defendant only asked Mohammed why he, Mohammed, had sought out Defendant at the mosque and asked Mohammed to meet the next day, March 10, 2001, to explain why Mohammed had sought Defendant out.

**Paragraph 11, Page 5:** The testimonial comments of Gilbert and/or Mohammed are inadmissible pursuant to <u>Crawford</u>, supra. There is no transcript of the March 10, 2001, meeting.  Mandhai did not prepare the plan, Gilbert did.   Mandhai had no group and never told Mohammed that he, Mandhai, had a group.  (See transcript of March 13, page 69 & 67 in which Defendant states he has no group).   In fact Mohammed explained at this meeting, that he, Mohammed, was a messenger from "Big Brother" for whom Mohammed worked.   Mohammed wanted Defendant to join Mohammed's group.  Defendant refused, at which point Mohammed became upset and made a telephone call acting as if the person he was speaking with was a member of the group.  At that point Defendant then briefly mentioned Gilbert and Gilbert's

plan. This was repeated on March 13, discussed below, and is noted on page 66 of the transcript for March 13, wherein Defendant states to Mohammed that he (referring to Gilbert) told me this idea.

**Paragraph 12, Page 5:** Defendant relies on the transcript of the meeting of March 13 to refute the allegations of Paragraph 12. In page 4 thereof Gilbert is referred to as the leader. Gilbert stated that he would do the training and planning. It appears as if neither Mohammed nor Gilbert knew that the other was an informant[1]. Mohammed, not Defendant, claimed that Mandhai was to handle recruiting, underscoring that there was no group yet. Finally Mandhai denies asking Mohammed for $1,200 to $1,600 to obtain weapons at any time. In support thereof Defendant notes (page 34 of the transcript) that Gilbert is responsible for the budget even as Mohammed is assigning roles.

Finally on page 43 both informants, much older and more experienced than Defendant, are relaying and re-enforcing credible threats in Defendant's presence. The threats relate to death for anyone, including Defendant and his entire family, should the "mission" be betrayed.

The Government's entire case is built on the premise that Defendant would have carried out Gilbert's and Mohammed's plan and that Mohammed could supply bombs and weapons. Sham explosives were displayed. It is therefore entirely disingenuous to discount the effects of these threats on

---

[1] The case agent falsely testified at the pre-trial detention hearing in this case that Gilbert was not a paid FBI informant. The only explanation for such an otherwise blatant misrepresentation is that the case agent and Mohammed were working separate and apart from whomever in the FBI and/or the government was controlling or attempting to control Gilbert. A logical inference from this is that neither Gilbert nor Mohammed initially knew that both were playing similar roles.

USA vs. Mandhai
Case No. 02-60096-CR-DIMITROULEAS
Page 9 of 28

Defendant. The very credibility of the entire case, as claimed by the Government, supports the validity and efficacy of these threats as relates to Defendant.

**Paragraph 13, Page 5:** Gilbert provided Mohammed with the photographs. The transcript of this meeting, (page 38, 40) refers to Gilbert providing an entire package and having everything ready. The photos were taken by Gilbert on March 13, (see page 60-61) at Mohammed's request (page 40-41).

Defendant also notes that the handout on jihad was not for the mission and that this was excepted from the offense conduct at Defendant's plea. Gilbert prepared the budget. Mandhai's participation in the preparation of the weapons and equipment list was clerical at best.

**Paragraph 14, Page 6:** Defendant adds in relation to the "cookbook" received from Gilbert, that he did not understand it (see page 50 of transcript of March 13/or March 17, Page 28-29). This book was legally and easily available. For example, Bob's Newstand, about ten blocks south of the Courthouse, usually had copies. Defendant also explains that Gilbert, not Defendant, created the training program, as a way to make money. Gilbert was to conduct all "training", Mohammed was uninvolved, and Mandhai had no experience. In addition only Gilbert's phone number is on the flyer relating to training, thereby showing that Defendant was not even to be involved in scheduling any training.

USA vs. Mandhai
Case No. 02-60096-CR-DIMITROULEAS
Page 10 of 28

**Paragraph 16, Page 6:** Defendant did not regularly correspond with Aksoy.  Aksoy wrote a letter to Abdul Salam, a member of the Darul Uloom congregation that Salam published to the congregation.  In response Defendant wrote Aksoy asking why he had been arrested.  Aksoy wrote back saying he had been arrested for illegal papers and an illegal gun.  Aksoy sent another letter that Defendant's father intercepted so that Defendant never saw Aksoy's second letter.  (See FBI 302 of 5/29/02 page 2).

At the meeting of March 23, 2000, as set forth in the transcript, Defendant (page 2), referring to his decision to quit the mission, explains that it was Defendant's decision, not Gilbert's, as Mohammed had intimated. Defendant further explained (page 2) that Gilbert (Saif Allah) came to Defendant on Sunday to convince Defendant to stay in the mission. Mohammed also disparages Gilbert as being in it only for the money, justifying the expulsion of Gilbert from the conspiracy (page 8).  Defendant again explained, on page 8, that he had no people.  Mohammed understood that Defendant was on the fence as to the mission, as he had been throughout his interaction with the informants, and tries to manipulate Defendant to force him to commit to the mission (see page 8).

**Paragraph 17, Page 6:** The proposed jihad training was never related to the "mission" or any local action but was to strengthen the local Muslim community as per the plea colloquy, Mohammed continually pressured Defendant to complete the "mission" (See page 3 of transcript) of 3/27). Mohammed confronted Defendant about whether Defendant was really serious

USA vs. Mandhai
Case No. 02-60096-CR-DIMITROULEAS
Page 11 of 28

about carrying out the agreement (mission), again demonstrating Defendant's obvious lack of commitment even as late as 3/27.

**Paragraph 18, Page 7:** Defendant did not request that Mohammed produce or bring to the meeting any weapons or explosives and was unaware that Mohammed was bringing same to the meeting.

Defendant and Jokhan went to the gun shop to inquire about a gun for training, an activity accepted from the criminal activity to which Defendant pleaded guilty.

**Paragraph 19, Page 7:** All such testimonial hearsay is inadmissible pursuant to <u>Crawford</u>, supra. Defendant denies leading any private 30-minute meeting at the mosque relating to jihad.  Mohammed continually steered general conversations at the mosque such as the one to which this paragraph refers to discussions about fighting overseas.  In fact, Mohammed claimed to have been wounded in such overseas fighting.

**Paragraph 20, Page 7:** Defendant adds that he informed the others his father would never allow him to keep an AK47 or any weapon at his home. Defendant only wanted a legal weapon for training purposes (transcript of April 23, page 17).

**Paragraph 21, Page 7:** At this point in time Defendant has not requested any weapons for the mission.  Mohammed "like a leader" (page 10 of transcript of April 23, 2001) told Defendant that they should buy an illegal weapon because it would be too risky otherwise.  Mohammed continuously lobbied for illegal weapons.  Defendant specifically explained that he was not

even thinking about the mission when he was listening to Mohammed discuss weapons (page 16) as he had previously quit the mission. Mohammed, who had previously praised Defendant as a leader, now belittles Defendant as an inexperienced 19 year old (page 21, 27) as part of his manipulation of Defendant.

Finally, after repeated and continued pressure Defendant again agrees to do the mission (page 31 "I am ready" and page 32 "bring the stuff"). Mohammed realizing, after months of effort, that he finally extracted a firm commitment from Defendant, is jubilant. (See page 34 of transcript, "we got it guys we got it ... I just hope you were listening..."). Defendant requests leave to play this portion of the tape at sentencing.

**Paragraph 23, Page 8:** As previously noted Defendant was in and out of this conspiracy. Similarly, although the possibility of civilian casualties was discussed if the mission were to ever take place, Defendant also stated (page 77) that "... we just concentrate on the transformers..." and that the point "of the exercise" was that no one be killed as the targets were the transformers and the armory.

Additionally Jokhan, who joined the conspiracy during this meeting, was recruited by Mohammed who "closed" the deal at this meeting. Defendant did not recruit Jokhan although he did bring him to the meeting.

**Paragraph 25, Page 9:** Final preparations were agreed upon. This meeting was to discuss Defendant's demand that he would not do the mission until Aksoy was bonded out of jail by Mohammed's group a condition precedent

USA vs. Mandhai
Case No. 02-60096-CR-DIMITROULEAS
Page 13 of 28

that would never ocurr.  In the mean time Jokhan appears to no longer be interested in the mission, (see page 16 of the transcript of April 30, 2001). During the meeting the shaky agreement totally falls apart.  Defendant reiterates that he has no group (page 40), that he never called Mohammed back after previously quitting (page 27, 41) that Defendant "will not do the mission" (page 11),  and wants nothing more to do with Mohammed "let's finish it, man" (page 43) referring to the relationship between Defendant and Mohammed. In response Mohammed attempts to reel Defendant and Co-Defendant back into the agreement (page 29, 30, 35, 36, 42, & 43).

**Paragraph 26, Page 9:** The testimonial hearsay recounted herein is inadmissible pursuant to Crawford, supra. Defendant does not recall asking for any bomb for immediate use at a final meeting.  Defendant remembers going with Mohammed to "scout" transformers but is unclear as to the date. (There is no transcript for May 3).  There are no tapes nor discovery documents corroborating this claimed meeting nor have either the dates or location of the meetings been alleged.   Paragraph 26 recites only that these meetings were claimed to have occurred sometime after May 3, 2001.

**Paragraph 27, Page 9:** There are no transcripts of this call nor does Defendant recall receiving this call. This testimonial hearsay is inadmissible pursuant to Crawford, supra.

**Paragraph 28, Page 9:** Defendant notes, in response to that portion of the interview wherein Defendant "has no explanation for not calling law

enforcement", that he mentioned the threats disclosed in the response to paragraph 12 hereof, contained in the transcript of March 13, page 43.

**Paragraph 29, Page 10:**        As stated in the response to paragraph 13 above, Gilbert initiated the plan and provided all information.

**Paragraph 31, Page 10:**        The reference to jihad was a general reference referring to possible overseas actions with Jokhan.

**Paragraph 32, Page 11:**        Defendant denies discussing any jihad with Jokhan against America, except when discussing Gilbert's plan in Mohammed's presence.  Defendant adds that Jokhan did not claim, in June 2001 (before his plea bargain) that he, Jokhan, was recruited by Defendant.

**Paragraph 33, Page 11:**        Defendant denies recruiting or attempting to recruit anyone for the crime or for jihad in America.   Defendant did accompany Gilbert when Gilbert went to two other mosques to post flyers for his, Gilbert's, training classes.  Defendant did not train with Gilbert for jihad in the United States or for the mission.   The Defendant knew that he would not be allowed to keep an AK 47 in his house against his father's wishes.  Finally Defendant and Co-Defendant withdrew from the mission before Mohammed left town.

### Role Assessment

**Paragraph 34, Page 12:**

Defendant did not recruit Jokhan for the mission by himself. Defendant did not supervise or control Jokhan with regard to training. Jokhan was the only co-conspirator not a Government agent or employee.  Defendant can not

receive a two level adjustment for his leadership role in the offense, <u>United States v. Yeager</u>, 331 F. 3rd 1216 (11th Cir. 2003), as Defendant did not take primary responsibility for any distinct component of the plan, nor did Defendant control or influence Jokhan with respect to that distinct component of the plan.   Accordingly Defendant cannot be assessed a leadership enhancement.

Defendant did not attempt to secure financial backing for the conspiracy (Mohammed explained numerous times that money was not a problem) nor did Defendant choose a target or time for the potential attacks. Jokhan did select a target.  Defendant had no experience, and neither access or control to or over money, training, equipment or explosives.   Defendant's conduct does not warrant a two level increase as an organizer, especially where his "recruit", the only non Government coconspirator, was accorded a minor role.

### Offense Level Computation

### Paragraph 40, Page 13, Specific Offense Characteristics: The Appellate Court, during oral argument, clearly noted that

> "although Defendant talked the talk he would never walk the walk."

This guideline allows a three-point reduction for an unsuccessful conspiracy <u>or</u> attempt.  Defendant pled to a conspiracy to attempt arson from which he withdrew well before completion.

### Paragraph 41, Page 13:          Victim related Adjustment:

The Defendant objects to this draconian enhancement, Defendant's guide line range and corresponding sentence, but for this enhancement, was as follows:

| | |
|---|---|
| Base Offense Level | <u>20</u> |
| Organizer enhancement | <u>+2</u> |
| Acceptance of responsibility | <u>-3</u> |
| Range 30 to 37months (Cr.Hrst I) | 19 |

The sentencing range, after reduction for acceptance of responsibility was 188 – 235 months.  John Walker Lindh, who fought on the ground with the Taliban against American soldiers, received a 240 month sentence pursuant to plea.  Defendant adds that one of the "worst of the worst", Hamdi, an enemy combatant secreted at Guantanamo after capture on the battlefield, was released without any charges ever being filed when the Government could not produce any evidence justifying its actions pursuant to his recent Supreme Court opinion. When terrorism is claimed to be afoot it appears that the Government feels unrestrained by any rules or basic fairness. The FBI for example has recently revealed that has extensive files on the ACLU.

### A.     The *Blakely/Booker* Objection

Defendant objects to this enhancement based on <u>Blakely/Booker</u>, supra. Defendant specifically denied the very conduct alleged as the basis for this enhancement, his association with Aksoy and 'jihad' training. There were no specific allegations of terrorism contained in the indictment.

### B.   The Charged Offense is not a Federal Crime of Terrorism

Pursuant to USSG § 3A1.4 the terrorist enhancement applies to a federal crime of terrorism as defined in 18 USC § 2332 b(g)(5).  The crime to which Defendant pled guilty, conspiracy to attempt arson, is a violation of 18 USC § 1844 (n).  This is not a crime included in the definition of Federal Crime of terrorism contained in 18 USC § 2332 (b)(g)(5) so that the enhancement predicated upon the statute can not apply, United States v. Arn Aout, 282 F. Supp. 2d 838, (N.Dist. of IL Eastern Division 2003).  Nor did Defendant's conduct transcend National Boundaries, United States v. Salim, 287 F. Supp. 2nd 250 (S.D.N.Y 2003).

The Sentencing Commission is not a legislative body and does not have the authority to pre-empt Congress, United States v. LaVonte, 520 U.S. 751 (1997) (In fact one ground for upholding the guidelines in the face of a separation of powers argument was that the sentencing commission is an arm of the Judicial branch for which sentencing is a traditional duty.)  Application Note 1 of U.S.S.G § 3A1.4 was amended shortly after Defendant was originally sentenced.

Application Note 1 now specifically incorporates the specific statutory definition of a crime of terrorism as its definition, which does not include the crime of conviction. At worst, the note makes this guideline ambiguous. Pursuant to the rule of lenity such ambiguity is to be resolved in favor of Defendant.

USA vs. Mandhai
Case No. 02-60096-CR-DIMITROULEAS
Page 18 of 28

However, application Note 4, USSG § 3A1.4, notes that the mandatory adjustment provided by the guideline at issue applies <u>only</u> to federal crimes of terrorism. Terror related crimes (any offense calculated to influence or affect the conduct of government by intimidation or coercion or related to one of the offenses specifically enumerated in 18 USC § 2332 (b)(g)(5)(B) if the motive was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion) is a basis for a limited but not mandatory upward departure.

Defendant's crime does not qualify him for the mandatory upward departure to level 32, crime history VI, as the application notes create a distinction between a specific federal crime of terrorism (Note 1) and a non delineated but related crime (Note 4), such as the crime of conviction.

### C. The Terrorist Enhancement Can Not Be Applied Because it is Based Upon Speculation Upon Speculation

In the instant case the viability of a terrorist enhancement is based upon speculation upon speculation upon speculation. First and foremost; Defendant withdrew from this offense numerous times. Second; the subject of the agreement was to <u>attempt</u> to commit arson. Third; there was no chance that any arson could have ever occurred. Fourth; the Defendant had no access to money, equipment, training or experienced coconspirators. Fifth; the Defendants had wavered both as to their commitment to "the mission" and the targets for "the mission" calling their future intent into doubt. Sixth; there is nothing by which the effectiveness or success of the mission can be determined, i.e., whether or not civilian populations would be disrupted so that

chaos would ensure.   Seventh; there is no calculus by which one can determine, based on the above, if Defendant would have ever attempted to make demands on Government Policy.   In short Defendant's actions were insufficient to divine his true intent. The FBI didn't arrest Defendant for almost a year after meeting with him, clearly demonstrating that it didn't consider him a threat to act. Defendant's intents to act was no more or less valid, then the informants' veiled threats, Par. 12, Pg 5.

### D. The Government's Conduct Precludes the Application of the Terrorist Enhancement

Although not rising to the level of a complete defense, the conduct of the Government in this case was sufficiently outrageous; constituted sentencing factor manipulation and sentencing entrapment such that this enhancement should not be applied. All the arguments raised herein are now legally appropriate as a basis for a downward adjustment.

The defense of outrageous government conduct focuses on whether the Government's methods comported with the Fifth Amendment guarantee of due process, United States v. Russell, 411 U.S. 423 (1973); United States v. Sanchez, 138 F. 3rd 1410 (11th Cir. 1998).

Sentencing factor manipulation focuses on the Government's conduct. Sentencing entrapment focuses on a defendant's predisposition. In United States v. Govan, 293 F. 3rd 1248 (11th Cir. 2002) the Court did not rule out sentencing manipulation  but instead determined that the facts before it did

USA vs. Mandhai
Case No. 02-60096-CR-DIMITROULEAS
Page 20 of 28

not support such a claim. Sentencing factor manipulation is now a viable defense in this Circuit and is applicable because of the facts in this case.

Subsequent to *Apprendi* the Circuit reconsidered sentencing entrapment in <u>United States v. Ryan</u> , 289 F. 3rd 1339 (11th Cir. 2002), simply stating that, under the facts presented to it, such a defense was not applicable. Sentencing entrapment, is now a viable defense.

As <u>Ryan</u>, supra discussed, a defendant's initial burden related to entrapment is to show that Government inducement including an element of persuasion, a mild coercion, opportunity plus something like excess pressure or manipulation of a non-criminal motive. Persuasion or mild coercion may be shown if a defendant demonstrates he had not favorably received the Government plan so that the Government had to push it on him, or that several attempts in setting up an illicit deal had failed or on at least one occasion he had directly refused to participate.

The acts of the Government in this case clearly support one or all of the above although not to the extent necessary to rise to a complete defense. Defendant clearly refused numerous Government invitations to participate. Defendant, as recognized by the Eleventh Circuit, flip-flopped, moving in and out of the conspiracy. Defendant was clearly manipulated using the non-criminal motives of securing him a position at the highly selective religious school in Medinah, and traditional Islamic beliefs relating to hospitality, sharing meals, and the respect <u>owed</u> from the young to teachers and elders. The informant also alternatively appealed to Defendant's manhood then

USA vs. Mandhai
Case No. 02-60096-CR-DIMITROULEAS
Page 21 of 28

denigrated him as an immature teenager. Defendant had no weapons, access to weapons, training or experience. Defendant repeatedly walked away and was repeatedly re-contacted by the Government agents. Defendant never took any steps on his own to effectuate the object of the conspiracy.

Sentencing factor manipulation, above that inherent in a sting, even if insufficient to support an entrapment defense or due process claim, must still be filtered out of the sentencing calculus, <u>Sanchez</u>, supra, <u>United States v. Connell</u>, 960 F. 2nd 191 (1st Cir. 1992). The <u>Sanchez</u> court determined, without concluding there was no such defense, that the facts before it did not justify its application. In contrast, the facts herein do support such a sentencing defense.

Defendant's conduct does not meet the definition of terrorism as defined in 18 U.S.C § 2332 (b)(g)(5)(A)(B) in that the conduct does not transcend national boundaries, <u>Salim</u>, supra, 287 F. Supp. 2nd 250 (S.D.N.Y. 2003). Defendant's conduct was certainly closer to a terror-related crime justifying a lesser upward departure.

**<u>Paragraph 42, Page 13:</u>**          **Adjustment for Role in the Offense:**

Defendant objects to this enhancement pursuant to <u>Blakely</u>, supra, and <u>Booker</u>, supra. Defendant was not an organizer in this conspiracy.  The first informant, Gilbert, developed the plan.  The second informant, Mohammed, was to provide the skills to make the necessary devices, the equipment and material for the devices and the funding for any operation.  Although Defendant is alleged to have recruited his co-defendant, there was no group nor any possible way that  Defendant made any leadership decision with regard

USA vs. Mandhai
Case No. 02-60096-CR-DIMITROULEAS
Page 22 of 28

to the non existent organization or the mission.  Mohammed keyed the time of

the mission to his preparation of the bombs partial or incomplete. Recruitment

of one man for a two man conspiracy, without more, is just not enough.

Additionally the undersigned misinformed Defendant that an adjustment

for role in the offense as an organizer or leader would be subsumed or trumped

by the terrorism adjustment.

### Paragraph 47, Page 13:          Total Offense Level:

Defendant's total offense level is as follows:

| | |
|---|---|
| All objections granted | Level 14 |
| Objections RE: Leadership Role | Level 29 |
| Only adjustment for acceptance of responsibility granted | Level 31 |

### Paragraph 50, Page 13:          Criminal History Computation:

If Defendant's objections to the terrorist adjustment are granted then

Defendant's criminal history category is I.

### Paragraph 84, Page 19:          Guideline Provisions

The Defendant's guidelines sentencing range is as follows:

a.   All objections granted, Level 14 criminal history I,          15-21 months;

b.   Objections as to role granted, Offense Level 29, Criminal History Category VI,          151-188 months;

c.   No objections granted, Level 31 criminal history VI,          210-240(262) months.

USA vs. Mandhai
Case No. 02-60096-CR-DIMITROULEAS
Page 23 of 28

### Request for Downward Departure from Advisory Guidelines

The terrorist enhancement herein results in a sentence that is far too harsh for Defendant's offense conduct, criminal history and ascertainable intent in light of the facts and the law, as clearly found by the 11th Circuit in its first opinion.  Such a sentence is simply not reasonable.

### Facts

Defendant voluntarily withdrew from the conspiracy to attempt to commit arson on numerous occasions.  Defendant was 18 and 19 years old at the time of the offense and was utterly without the capabilities, either personally, financially, or by virtue of his experience and temperament, to ever complete any conspiratorial goal.  The guidelines contemplate that a conspiracy or attempt should be punished just as the substantive crime.  To do so in this case would be a grave injustice and a violation of substantive due process.

The government was heavily involved in the creation of this case, and indeed orchestrated all of its "sexy" attributes.  At one point prosecution was declined because it was determined that the Defendant was entrapped.  Defendant was also partially coerced into participation because of not so subtle death threats to him and his family (meeting of March 13, pg 43).

Defendant is significantly less culpable than the "average terrorist."

### Specific grounds for departure

The Court may implement a downward departure by restructuring the Defendant's guidelines level and/or his criminal history.   But for the enhancement the Defendant would be criminal history I, as he has no prior

USA vs. Mandhai
Case No. 02-60096-CR-DIMITROULEAS
Page 24 of 28

arrests or involvement with law enforcement of any kind. There is no criminal history. Criminal history category VI significantly over represents the Defendant's criminal history and the inferences drawn therefrom of recidivism and dangerousness. A departure from criminal history VI is appropriate and lawful, <u>United States v. Maskini</u>, 319 F. 3rd 88 (2nd Cir. 2003).

## **Duress**

Both Government agents made death threats in Defendant's presence Re: people like Defendant and his family, should Defendant fail to follow thru on the informants' plan.

## **Sentencing entrapment**

Defendant is a victim of sentencing entrapment which, post *Booker*, has new validity in this Circuit.

## **Sentencing enhancement**

Defendant is clearly the victim of sentencing enhancement. But for the agents' manipulation of Defendants the conduct to which Defendant admitted would not justify a terrorist enhancement because the crime must be aimed at disruption of the Government. "Mohamed" was clearly the driving force behind the plan to submit demands upon the Government in particular and the entire scheme in general. This is particularly true in the instant case because Defendant's crime of conviction is not one specifically delineated as a crime requiring the mandatory terrorist enhancement.

USA vs. Mandhai
Case No. 02-60096-CR-DIMITROULEAS
Page 25 of 28

### Due process violation

The conduct of the Government is so outrageous that Defendant's sentence should be reduced. Defendant was the subject of not one but two carefully orchestrated schemes to entrap him into becoming a terrorist by not one, but two, Government agents. Defendant, young and inexperienced, was easy prey for these sophisticated and well schooled Government agents. Gilbert was in fact a double agent and was so skilled that he not only was able to "play" defendant but was able to "play" and ignore his FBI and other Government handlers. He was either a rogue agent or an uncharged coconspirator.

### First Amendment and Freedom of Association

Gilbert spoke to Defendant's mosque with an aim towards soliciting targets. This infringed upon Defendant's First Amendment rights of free speech and free association. The First Amendment restricts the ability of the State to impose liability on an individual solely because of his association with others, NAACP v. Claiborne Hardware Company, 458 U.S. 886, 73 L.Ed. 2nd 1215 ,102 S. Ct. 3409 (1982), Scales v. United States, 367 U.S. 203, 6 L.Ed. 2nd 782, 81 S. Ct. 1469 (1961). The First Amendment prohibits punishing an individual for mere membership in an organization even if the organization has both legal and illegal goals. The Government may not prohibit mere association.

Although not rising to the level of a complete defense, Defendant's association with others in his mosque, even with Aksoy or with his co-defendant, may not be prosecuted, even if one agrees, for purposes of

argument, that the associations had both legal and illegal goals. Given the heavy lifting that the Government agents had to do in order to ensnare Defendant and shift his conduct from legal association to illegal promotion of unlawful goals this should be grounds for a downward departure.

### § 5 K 2.0

The guidelines permit Courts to impose a sentence outside the applicable guideline range where there exists aggravating or mitigating circumstances of a kind, or to a degree, not <u>adequately</u> (emphasis supplied) taken into consideration by the Sentencing Commission in formulating the guidelines. The Court must determine whether any factor makes the case atypical, taking it out of the "heartland" of cases involving the conduct described in the applicable guideline and whether that factor should result in a different sentence, <u>United States V. Kapelushnik</u>, 306 F. 3rd 1090 (11th Cir. 2002).

The Eleventh Circuit remanded this case because the sentence did not fit the facts. This case is clearly outside of the heartland of arson cases, conspiracy to attempt to commit arson cases and terrorism cases. Any or all of the above cited reasons are grounds for this Court to depart downward. Now that <u>Booker,</u> supra, has made the guidelines advisory, this Court can craft an appropriate sentence.

### "Diminished" Jurisdiction

There is an insufficient connection between the Defendant's "attempt" as previously recognized by this Court and interstate commerce.

### Pre-indictment Delay

The 11th Circuit, <u>United States v. Stuart,</u> 384 F. 3rd 1243 (11th Cir. 2004), endorsed pre-indictment delay as a pre-Booker ground for departure but determined that the sentencing court in Stuart erred because the facts therein did not support a finding of prejudice from the delay. Given that the guidelines are now advisory, pre-indictment delay, even without prejudice, can support a downward departure. Defendant has been prejudiced so clearly pre-indictment delay is a ground for departure herein.

The Government was aware of the conduct which led to the charges herein from the moment that the Government orchestrated said charges in the spring of 2001, Defendant was not indicted until early summer 2002. Defendant has been prejudiced in numerous ways. First and foremost the climate in this country, the potential jury pool and indeed the very fabric of American life was forever altered by the events of September 11, 2001. Had Defendant been indicted in a timely fashion it is entirely likely that this case would have had a much different outcome, having been completed before September 11, 2001.

Second, the Government's failure to timely indict Defendant made it impossible for Defendant to investigate Gilbert, the un-indicted coconspirator/voluntary secret agent/confidential informant.

Similarly, the references to entrapment referenced by the FBI polygraph examiner would have been current so that the Defendant would be able to